Michael C. YERXA, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 277–80C.

United States Claims Court.

Oct. 14, 1986.

Neil B. Kabatchnick, Washington, D.C., attorney of record for plaintiff. Craig M. Kabatchnick, of counsel.

Mary Mitchelson, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

**OPINION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT**

REGINALD W. GIBSON, Judge:

## I. *Statement of the Case*

Plaintiff, Michael C. Yerxa, a former U.S. Air Force Reserve Captain, seeks the back pay and allowances of a captain from May 31, 1974, the date on which he was involuntarily discharged from military service, to April 30, 1979, the date on which he was released (because of retirement) from active duty following his subsequent reenlistment as an Air Force sergeant. His involuntary discharge was at the grade of captain and stemmed from his being previously "passed-over" or non-selected for promotion to the temporary grade of major by two successive selection boards. *See* Exhibit 4, App. 8, Retirement Order attached to Plaintiff's Cross-Motion For Summary Judgment, and 10 U.S.C. §§ 8368, 8846 (1982).[1] On May 20, 1980, prior to filing his petition here on May 28, 1980, plaintiff sought to have his involuntary discharge reversed to show continuous active duty in a commissioned status from May 31, 1974, to his retirement on May 1, 1979, by filing an application with the Air Force Board for the Correction of Military Records (AFBCMR). Before the AFBCMR, plaintiff contended, *inter alia,* that the 1972 and 1973 selection boards, which did not select him for the temporary grade of major, were not properly constituted with an "appropriate number" of reserve officers pursuant to 10 U.S.C. § 266(a) (1976).[2] In addition, plaintiff

1. Section 8368(c)(1) provides, *inter alia,* that—
(1) an officer who is deferred because he was considered but not recommended by a selection board shall be considered for promotion by the next selection board considering officers of his grade and category....
Section 8368(f) provides that—"A deferred officer who is again considered for promotion under subsection (c)(1) and is not recommended for promotion ... may not thereafter be considered for promotion ... and shall be treated as provided in section 8846(a) of this title and section 323(e) of title 32."
Section 8846(a)(1) and (2) provides that—
(a) ... a deferred officer who is not recommended for promotion under section

8368(c)(1) of this title shall, one year and 90 days after the date on which he would have been promoted if he had been recommended by the first selection board that considered him—
(1) be transferred to the Retired Reserve, if he is qualified and applies therefor; or
(2) if he is not qualified or does not apply therefor, be discharged from his reserve appointment.

2. Section 266(a), 10 U.S.C. provides:
(a) Each *board* convened for the ... *promotion,* ... involuntary release from active duty, discharge, or retirement *of Reserves shall include an appropriate number of Re-*

sought to have several Officer Effectiveness Reports (OERs) for the periods covering May, 1970 to May, 1971 and 1972–73 modified on grounds that they were not prepared on a "fair and equitable" basis as required by 10 U.S.C. § 8442(c) (1976). The AFBCMR disagreed with plaintiff on all counts, and on April 13, 1984, denied his application for relief in total.

Shortly following the filing with the board and during the pendency of his application therewith, and obviously to avoid an impending statute of limitations issue, on May 28, 1980, plaintiff filed his initial petition in the predecessor Court of Claims. On September 9, 1980, said petition was stayed pending a definitive determination of the application before the AFBCMR. The claims asserted in the petition were substantially analogous to those raised before the board. On July 26, 1984, following the AFBCMR's denial (on April 13, 1984) of plaintiff's application to the board, plaintiff filed his first amended complaint in this court. Therein, plaintiff argues that the AFBCMR's April 13, 1984 decision denying his claim was erroneous, arbitrary, and capricious, as a matter of law, for failing to find that his 1972 and 1973 selection boards were not properly constituted with an "appropriate number" of reserve officers pursuant to § 266(a). Similarly, as he did before the AFBCMR, plaintiff seeks an order from this court directing that the Air Force correct the previously challenged OERs covering the periods May, 1970 to May, 1971 and 1972–73 which were allegedly not prepared on a "fair and equitable" basis as required by 10 U.S.C. § 8442(c) (1976).

Before this court, the parties have cross-moved for summary judgment.[3] Plaintiff's motion, therefore, is a motion for summary judgment seeking back pay only on the grounds that the 1972 and 1973 selection boards were illegally constituted pursuant to § 266(a), *supra*. Defendant's motion, on the other hand, asserts that plaintiff's claims for back pay (premised on a violation of § 266(a)) and correction of military records (premised on defective OERs) are *both* barred by the equitable doctrine of laches. In short, defendant's position is that its motion for summary judgment, averring laches, is dispositive of all matters postured by plaintiff in his cross-motion for summary judgment. The substance of defendant's contention regarding laches is, therefore, that plaintiff's failure to assert either of the claims, *supra*, presented here for a period of almost six years (to be precise, five years, 11 months, 27 days), from May 31, 1974 (involuntarily discharged) to May 28, 1980 (petition filed here), was sufficiently unreasonable, inexcusable, and prejudicial so as to favor a bar to plaintiff's claims in this court pursuant to the doctrine of laches. Interestingly, defendant failed to address the merits of plaintiff's § 266(a) claim in its opposition to plaintiff's cross-motion. Undoubtedly, defendant perceived the laches doctrine to be dispositive of all of plaintiff's claims.

The material facts outlined by defendant's motion, and uncontroverted by the plaintiff in his cross-motion, are relatively straight forward. Plaintiff served in the United States Air Force from April 1959 to January 25, 1962, on active duty enlisted status as a navigator trainee. After appointment to the Air Force Reserve on January 26, 1962, as a Second Lieutenant, plaintiff was promoted to the rank of Reserve First Lieutenant and ultimately to Captain (permanent) on January 26, 1967. Thereafter, he was considered, but not selected, for promotion to the temporary grade of major by two selection boards

---

*serves*, as prescribed by the Secretary concerned under standards and policies prescribed by the Secretary of Defense. (emphasis added).

**3.** In his cross-motion for summary judgment, at footnote 1, plaintiff states—"Pending the Court's adjudication of the issues of laches and the violation of former 10 U.S.C. § 266(a) in relation to the defendant's motion for summary judgment and plaintiff's opposition and cross-motion, plaintiff requests that the Court defer consideration of the other matters presented in plaintiff's amended complaint as grounds for relief including, but not limited to, the issue of the error and/or injustice of the 1970–71 OER and the AFBCMR's denial of relief with respect thereto."

meeting on August 21, 1972 and September 17, 1973. Both boards were comprised of twenty-seven (27) line voting members with *only one (1) member of each* being a Reserve officer, as was plaintiff. Contrastingly, approximately 25.4% and 35% of those officers being considered for promotion by the 1972 and 1973 selection boards, respectively, were Reserve officers. As previously revealed, *supra*, by reason of plaintiff's being twice non-selected to the temporary grade of major, he was involuntarily discharged from the U.S. Air Force on May 31, 1974. *See* 10 U.S.C. § 8846.

Except for one attempt on June 27, 1975, when administrative relief was sought, *pro se*, on a claim *unrelated* to those presented in this court,[4] which was denied on June 22, 1976, plaintiff took no action to press the instant claims for nearly six years from his discharge date, when he did so on May 20, 1980 before the AFBCMR, and on May 28, 1980 with a petition to the predecessor Court of Claims. After extensive administrative proceedings (application filed May 20, 1980), relative to the issues later raised in the May 28, 1980 petition, the AFBCMR denied plaintiff's application on April 13, 1984. Thereafter, as related *supra*, on July 26, 1984, the amended complaint was filed, which defendant seeks to overcome by its plea of laches. Plaintiff conversely seeks back pay on the grounds that *legal error* was committed as a matter of law in that the selection boards were illegally constituted, thus his non-selection is *void ab initio;* as a consequence, he is entitled to reinstatement at the grade level of captain for the period May 31, 1974 to May 31, 1979.

**4.** Plaintiff's 1975 application to the AFBCMR "Request[ed] the following correction of error or injustice: (1) That the AF Form 100 pertaining to my Release from Active Duty be corrected to reflect the correct status of my release. Special attention to blocks 1, 2, 10, 13, 14, 15, 17, and sections 24, 25, 26. (2) That the DD Forms 4 and 214 also be corrected so as to be consistent with the AF Form 100. That ARPC be directed to retain me in N.A.R.S. until such time to allow me to meet the FY 76 ROPA Major Board or promote me to Major with the date of rank of the FY 75 promotees." Plaintiff's Cross-Motion, Appendix. We do not perceive this request to mirror the precise issues and deficiencies plaintiff has raised in this court. See Exhibits 8 and 10, App. 19–20 and 22, respectively, attached to plaintiff's cross-motion for summary judgment.

## II. *Discussion*

### A. *Laches*

The threshold question presented by the parties' respective motions is simply whether plaintiff's § 266(a) claim is barred by the affirmative defense of laches as asserted by the defendant. While defendant has also asserted laches relative to plaintiff's OER claim, we need not address that issue because we find, as discussed *infra*, that plaintiff is entitled to complete relief on the basis of the defendant's violation of § 266(a). Accordingly, given our finding in favor of plaintiff's § 266(a) claim, inasmuch as plaintiff's argument based on the defective OERs is an alternative theory of recovery, seeking the same relief as that sought based on the violation of § 266(a), we need not reach that issue. Relative to the back pay claim, which is grounded on a violation of 10 U.S.C. § 266(a), the specific issues we must decide in applying laches are: (1) whether plaintiff's complete failure to take any action thereon, following his first non-selection on August 21, 1972, his second non-selection on September 17, 1973, and then his involuntary discharge from military service on May 31, 1974, until May 20 and 28, 1980, was sufficient *unreasonable and inexcusable* delay as to support a finding of laches; (2) whether plaintiff has presented any legally recognizable *excuse* for said maximum seven-year, nine-month delay (August 21, 1972 to May 20, 1980); and (3) whether the circumstances of any period of unreasonable and inexcusable delay have resulted in sufficient *prejudice* to the government as to warrant the imposition of the laches doctrine. Following a brief background discussion of applicable precedent, we analyze each issue in turn.

### 1. Background—Laches Doctrine

Traditionally, this court and our predecessor court have applied the equitable doctrine of laches as a means to promote the vigilant pursuit of those claims ripe for adjudication and, in turn, by barring the claims of those who "slumber" on their rights. *See Brundage v. United States*, 504 F.2d 1382, 205 Ct.Cl. 502 (1974); *Foster v. United States*, 3 Cl.Ct. 440 (1983), *aff'd*, 733 F.2d 88 (Fed.Cir.1984); *Pepper v. United States*, 8 Cl.Ct. 666 (1985), *aff'd*, 794 F.2d 1571 (Fed.Cir.1986). Although previously a matter of controversy before this court, it is now clear beyond cavil that laches is a doctrine that is applicable to military pay cases rather than a remedy applied only in civilian pay matters. *Deering v. United States*, 620 F.2d 242, 223 Ct.Cl. 342 (1980) (*en banc*); *Foster*, 733 F.2d at 89. It is also generally held that laches is a doctrine in military pay cases whose period may commence and toll "apart from, and irrespective of" the statute of limitations, *Brundage*, 504 F.2d at 1384; and that laches is often a bar to plaintiff's claim well short of the running of the six-year statute of limitations. *See Brundage*, 504 F.2d at 1382 (three years and eight months); *Cason v. United States*, 471 F.2d 1225, 200 Ct.Cl. 424 (1973) (four years).

The effect and rationale of the laches doctrine was lucidly stated by the former Court of Claims in *Brundage v. United States*, 504 F.2d at 1384, as follows:

> Laches is a "fairness" doctrine by which relief is denied to one who has unreasonably and inexcusably delayed in the assertion of a claim. Failure to act promptly will operate as a bar to recovery where the delay results in injury or prejudice to the adverse party. The doctrine of laches is based upon considerations of public policy, which require, for the peace of society, the discouragement of stale demands. It recognizes the need for speedy vindication or enforcement of rights, so that courts may arrive at safe conclusions as to the truth.

Additionally, we emphasize that "laches is an affirmative defense rather than a claim for equitable relief." *See Foster*, 733 F.2d at 90. As an affirmative defense, like the statute of limitations, the burden with respect to prevailing on an assertion of laches is with the defendant. That burden is fulfilled only upon a showing of the existence of *two* elements: (1) that plaintiff's delay in pursuing his claim has been both unreasonable and inexcusable; and (2) that the period of delay has resulted in substantial prejudice or injury to the defendant. *Costello v. United States*, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *Brundage*, 504 F.2d at 1382; *Pepper*, 794 F.2d at 1573. Reason supports the imposition of laches because an "inordinate lapse of time carries with it the memory and often the life of witnesses, the muniments of evidence, and other means of definitive proof." *Erickson v. United States*, 1 Cl.Ct. 163, 166 (1983).

Similarly, as when the statute of limitations is asserted, the plea of laches avers that plaintiff's allegations are well pled, but as a matter of law, it is not entitled to recover because of the strong public policy against stale claims. Thus, even assuming legal error by the defendant that might otherwise entitle plaintiff to relief on the merits, such circumstance does not override the proven defense of laches. On the other hand, however, unlike the statute of limitations, laches is a "flexible concept based on fairness and is applied in the discretion of the court." Because of such circumstance, the "cause of the delay, the hardship to the defendant, the nature of the relief, and other factors must all be considered in determining its application." *See O'Brien v. United States*, 148 Ct.Cl. 1, 3 (1960). This approach was succinctly outlined by our predecessor court in the *O'Brien* case, wherein it was stated that:

> It is only where some great injustice would be done the defendant by so long a delay by the claimant that the doctrine of laches should be set up to defeat consideration of the claim on the merits. The equities on both sides

should be *carefully* weighed, and it should be clear that they weigh *heavily* on the side of the defendant before the court refuses to hear a case because of a delay of less than the statutory period. How the equities are to be balanced in one case is but little guide in another case. Each case must be considered in the light of its own facts and in the light of the relief sought.

*O'Brien*, 148 Ct.Cl. at 4 (emphasis added).

Against the foregoing established legal principles, we apply the operative uncontroverted facts at bar.

### 2. *The Unreasonableness of Plaintiff's Delay*

■ The initial element in the laches formula, *i.e.*, unreasonableness, is typically a measure of the *period* of delay between the time the cause of action accrues and the later point in time when litigation actually occurs upon the filing of a petition/complaint. As to the commencement of that period, a plaintiff's back pay claim normally accrues for purposes of laches, as well as for the statute of limitations, at the time of his separation from service. *Brundage*, 504 F.2d at 1382; *Jones v. United States*, 6 Cl.Ct. 531, 532 (1984). This rule, however, is only generally correct and not fully dispositive in considering the total permissible period in determining the time issues under laches. For example, as stated by our predecessor court in *Adkins v. United States*, 228 Ct.Cl. 909 (1981):

Where on notice of his claim and where plaintiff could have but failed to bring suit, he may be charged with periods of inexcusable delay *even though such periods occurred prior to the accrual of the claim for limitations purposes.*

*Id.* at 911. This esoterical point was also recently reiterated in the *Pepper* case where we stated that:

Central to a decision defining the period of laches ... is ... [the] notion that notice of one's claim, prior to that claim's actual accrual for limitations purposes in this court, may be sufficient to begin the running of the laches period.

*Pepper*, 8 Cl.Ct. at 673.

■ In the case at bar, we believe, given the foregoing precedent, that plaintiff may be properly chargeable with a period of unreasonable delay stemming from the date of his *first* passover, *i.e.*, August 21, 1972, and terminating at the earliest on the day before he filed his application before the AFBCMR, on May 20, 1980.[5] For several reasons *infra*, however, we find that equity, in fairness, favors commencing the period of laches, given the facts at bar, not upon that date, but rather upon the date of plaintiff's *second* passover, to wit, September 17, 1973. As a general proposition, from the point of view of *per se* notice to the plaintiff, it would be quite logical to argue that plaintiff had at the time of the first passover in 1972 all of the relevant information (or it was available to him) relative to the precise § 266(a) claim he asserted in 1980. Clearly, he then knew that he had been passed over. Given plaintiff's previously distinguished service record, reason should have moved him to question such a result. Had he made such an inquiry, there is no reason to believe that he would not have been informed of the selection board's precise composition, and the appropriate statutes, regulations and internal policies governing that composition. Usually then, on such facts, logic would support a finding of sufficient notice of one's claim to mark the start of the laches period. *See Pepper*, 794 F.2d at 1573-74; *Adkins*, 228 Ct.Cl. at 911.

However, on the other hand, we believe that *O'Brien*, 148 Ct.Cl. at 3 and 4, teaches us to proceed with measured caution in applying the doctrine of laches by its admonishment that:

---

5. In determining the period of the reasonableness of the delay in litigating an issue, this court and the predecessor Court of Claims refuse to charge in the formula such times as the plaintiff seeks permissive administrative relief before appropriate boards. *Braddock v. United States*, 9 Cl.Ct. 463 (1986); *Yongue v. United States*, 9 Cl.Ct. 635 (1986); and *Cason v. United States*, 471 F.2d 1225, 200 Ct.Cl. 424 (1973).

*laches ... is a flexible concept based on fairness* and applied in the discretion of the court. The cause of the delay, the hardship to the defendant, the nature of the relief, and other factors must all be considered in determining its application.

\* \* \* \* \* \*

It is only where some *great injustice* would be done the defendant by so long a delay ... that ... laches should ... defeat ... the claim on the merits.

(emphasis added). Against this background, and because of the peculiar facts and circumstances in this case, we do not choose to hold that the beginning period for the running of laches commences at the time of the first passover on August 21, 1972. But rather, we believe, as a "flexible concept" on these facts, that equity favors *not* holding the plaintiff to such a rigorous standard of due diligence in order to avoid the bar of laches. Thus, in light of the two additional operative circumstances detailed *infra*, and the teachings of *O'Brien, supra*, we are convinced that reason and fairness argue strongly for the adoption of the date of the *second* passover, *i.e.*, September 17, 1973, as the date for the commencement of the period of laches. First, there is the delicate situation we believe plaintiff would have perceived himself to be in had he vigorously challenged the *first* passover, knowing that the critical next selection board review was to follow relatively closely thereafter. We are convinced that plaintiff reasonably might have weighed the negative and could have been persuaded by the desire not to "rock the boat" for fear of exacerbating his problems. Moreover, after reviewing his previously outstanding record, he further may have concluded that the first passover was simply an aberration, and that it was reasonable and prudent to proceed with caution, rather than assert a provocative challenge, in the belief that he would be fully vindicated by the upcoming second selection board.

Second, and closely related to the foregoing, there is the realistic possibility that by adversarily challenging the first selection board's determination, prior to the time of the consideration by the second selection board, plaintiff could have reasonably believed that his position before the second selection board would have been prejudiced. This would, of course, be a particularly valid concern of plaintiff were it to evolve that a final decision on his challenge to the first board was not forthcoming prior to the time the second selection board met. In applying the doctrine of laches, we believe that this court must be mindful and sensitive to these nuances in addressing the issue of the reasonableness of the cause of the delay. Because that is so, we find plaintiff's delay between the dates of the first and second selection boards to be reasonable under the circumstances. Based on both of the foregoing additional considerations, therefore, we find that the period for charging plaintiff with unreasonable delay shall commence from the date of the second selection board passover, *i.e.*, September 17, 1973.

&#9646; Measuring forward from September 17, 1973, to the date plaintiff filed his application with the AFBCMR (May 20, 1980), rather than the date plaintiff filed his petition in this court, May 28, 1980, there has accrued a period of six years, eight months, and three days.[6] Throughout said period, it is undisputed that absent a substantially contemporaneous filing on May 20, 1980 with the AFBCMR, plaintiff has made no attempt to voice his dissatisfaction with either selection board review, nor did he seek a reversal of his discharge on any of the specific grounds asserted here. Clearly, then, the foregoing period, standing alone, is more than sufficient in terms of time to constitute an unreasonable period of delay for purposes of laches, and we so find. Our predecessor court has deemed adequate for purposes of laches far shorter periods of time. *See Norris v. United States,* 257 U.S. 77, 42 S.Ct. 9, 66 L.Ed. 136 (1921), *aff'g,* 55 Ct.Cl. 208 (1920) (11 months); *Brundage,* 504 F.2d at 1382 (3 years and 8 months); *Cason v. United*

---

**6.** See footnote 5, *supra*, regarding the eight days between May 20, 1980 and May 28, 1980.

*States*, 471 F.2d 1225, 200 Ct.Cl. 424 (1973) (4 years). However, the relevant inquiry does not end at that point, *infra.*

### 3. *The Inexcusability of Plaintiff's Delay*

Plaintiff proffers several excuses for his failure to act and reasons why laches is inappropriate given the facts of this case. Contrary to the assertion(s) of the defendant, not all are without merit. We discuss each such contention in turn.

■ First, plaintiff argues that "there is 'legal error' present in this case which 'overcome[s] the application of laches,'" *citing Adkins v. United States*, 228 Ct.Cl. 909 at 913. Plaintiff's Cross-Motion for Summary Judgment at 14. While *Adkins* remains good law, that case was not one in which the court found "legal error" which overcame the bar of laches, nor did it fully explain the language quoted by plaintiff which appears in the last sentence of the discussion in the Court of Claims order. On this basis alone, the case is clearly distinguishable. More importantly, however, plaintiff cites us to *no* case, nor do we find one, in which the affirmative finding of an alleged "legal error" was held to have overcome or defeated the otherwise proven defense of laches. Whatever the meaning the *Adkins* court intended for this vague reference to "legal error" overcoming the "application of laches," we believe it is properly treated as amounting to no more than the obvious *obiter dicta* that it is.

Moreover, in the CAFC decision in *Foster*, 733 F.2d at 88, the precise legal error (*i.e.*, violation of 10 U.S.C. § 266(a)) asserted by plaintiff here was admitted by the defendant, yet the court there recognized no legal impediment, based thereon, in affirming the Claims Court's decision dismissing on the ground of laches. Specifically, the CAFC in *Foster* found that the plaintiff "alleged and the Government admitted that the [selection] boards were improperly composed in violation of 10 U.S.C. § 266 in that they did not include an 'appropriate number' of reserve officers as mem-

bers." *Foster*, 733 F.2d at 89. While we acknowledge that an express holding to the effect that "legal error" *cannot* overcome laches is not found in that opinion, we believe the import of the Court of Appeals affirmance in *Foster*, in the face of its specific finding relative to the existence of the identical legal error alleged here, is a most persuasive precedent for guiding our rejection of plaintiff's identical claim here.

■ Second, plaintiff argues that his timing in "seeking judicial relief was reasonable and excusable since he had no knowledge of the violation of former 10 U.S.C. § 266(a) until subsequent to his seeking relief in May 1980...." Plaintiff's Cross-Motion at 20. In support, plaintiff reiterates "the long-standing doctrine of the presumption of regularity of the record," citing *Sanders v. United States*, 594 F.2d 804, 813, 219 Ct.Cl. 285 (1979), and that "public officials will act in accordance with the law," *Matthews v. United States*, 526 F.Supp. 993, 999 (M.D.Ga.1981), to justify his decision not to challenge the composition of the 1972 and 1973 selection boards until mid–1980. *Id.* at 20–21. From this line of argument, it is clear that plaintiff is asserting that because of the aforementioned presumptions, he had no affirmative duty to seek out the factual or legal basis of any such potential claims. Such an excuse could not be farther from the truth. Indeed, this court has consistently held that ignorance of the factual or legal basis of a claim is no bar to an application of laches. *Foster*, 3 Cl.Ct. at 444; *Jones*, 6 Cl.Ct. at 533; *Pepper*, 8 Cl.Ct. at 674. Rather, as ably stated by Judge Nettesheim in *Foster*:

> Plaintiffs were bound to know that the statute in these cases required representation of an "appropriate number" of reservists and were bound to take action to ascertain whether the representation was appropriate.

*Foster*, 3 Cl.Ct. at 444. Plaintiff's claims to the contrary, we find, are without merit.

■ Lastly, plaintiff argues that at worst he should be held responsible for

only three (1973–1977) of his six-year, eight-month delay because from February 23, 1977, to April 16, 1980, it was the precedent of this court, under *Sidoran v. United States*, 550 F.2d 636, 213 Ct.Cl. 110 (1977), that laches was *not* a doctrine applicable in military pay cases. *Sidoran* was reversed in 1980 by *Deering v. United States*, 620 F.2d at 242. While we acknowledge that this court in the case of *Andrews, et al. v. United States*, 6 Cl.Ct. 204 (1984), *aff'd sub nom, Burden v. United States*, 770 F.2d 179 (Fed.Cir.1985) (only as to appellant Burden), specifically rejected this argument, for the reasons stated *infra*, we must respectfully disagree with the reasoning adopted by the *Andrews'* court. In so doing, we believe plaintiff here proffers a legally sufficient excuse for not pursuing his claim during the period in which *Sidoran* was good law (February 23, 1977—April 16, 1980).

We begin by noting that contrary to the position of the defendant, and the court in *Andrews*, we do not find any case in either our predecessor court or the CAFC to have either expressly or impliedly rejected the plaintiff's precise argument herein that he should not be held to have unreasonably delayed during the period in which *Sidoran* was good law. The *Andrews'* court held that to excuse a plaintiff's delay during the period in which *Sidoran* was good law would be inconsistent with the Court of Claims holding in *Deering*, 620 F.2d at 242. This is so, according to the government, because in overruling *Sidoran*, the *Deering* court expressly charged the plaintiff therein with unreasonable delay during the period of the incumbency of *Sidoran;* and the *Andrews* court concluded, therefore:

[i]f laches were "tolled" during *Sidoran's* incumbency, then *Deering* was wrongly decided and should have announced a prospective rule only, instead of imposing the bar on the plaintiff in that case.

*Andrews*, 6 Cl.Ct. at 208. All due deference to the foregoing *Andrews'* observation, we believe, nevertheless, that a close reading of the court's decision in *Deering* to present no such inconsistency.

The facts relied on by the *Deering* court, for purposes of laches, are relatively uncomplicated. The court's holding charged plaintiff with unreasonable and inexcusable delay from his date of discharge, June 24, 1971, to the date he filed suit, June 24, 1977, a period of exactly six years. When plaintiff proffered as an excuse for his delay, a reliance on the holding in *Sidoran*, that laches did not run while he was an enlisted man, the court responded:

Announcement of the *Sidoran* case certainly could not serve as reasonable excuse, since it [*Sidoran*] was decided on February 23, 1977, some five years and eight months *after* plaintiff's separation. *Such a period is usually sufficient to constitute laches.*

*Deering*, 620 F.2d at 246 (emphasis added).

We believe, therefore, that at a minimum the *Deering* court was saying that there was *no need* to consider the impact of the four-month period of *Sidoran's* incumbency. This is true because *independent* of that period (*i.e.*, February 23, 1977 to April 16, 1980), five years and eight months had expired *following* Deering's involuntary discharge on June 24, 1971, prior to the *Sidoran* decision on February 23, 1977, and that that fact alone was a sufficient period to constitute laches. Moreover, it appears that the Court of Claims' statement may even imply that *had* the laches period there fully embraced the period of *Sidoran's* incumbency, it would have been considered in mitigation. In any event, it is clear that the holding in *Deering* was not based on a finding that the period of *Sidoran's* incumbency was an improper period to accrue in mitigation of the period of unreasonable delay in computing laches. This was so because an unreasonable period had run fixing laches, prior to the *Sidoran* decision. To that extent, anything the *Deering* court had to say relative to the impact of *Sidoran* on computing the period of laches, we view as *obiter dicta*.

Having demonstrated our reasons for departing with the *Andrews* court, we also concomitantly note our reasons for finding

that plaintiff's delay here was legally excusable during the three-year, one-month and 21-day period of *Sidoran's* incumbency (February 23, 1977 to April 16, 1980). We do not find this to be a difficult task because it has long been held that, "[w]here laches is raised, knowledge of the law is imputed to all plaintiffs." *Jones*, 6 Cl.Ct. at 533. *See Ide v. United States*, 25 Ct.Cl. 401, 408 (1890); *Foster*, 3 Cl.Ct. at 444, *aff'd*, 733 F.2d at 88. *See also Harris v. Lykes Bros. Steamship Co., Inc.*, 375 F.Supp. 1155, 1158 (E.D.Tex.1974), *cited with approval in Weber v. United States*, 553 F.2d 105 (Ct.Cl.1977). In other words, if knowledge of the law which is unfavorable is imputed, no sound reason exists to fail to impute knowledge that is favorable. Thus it seems contrary to any definition of equity to hold on the one hand that a plaintiff is *not* excused from the negative effect of laches when he alleges he did *not* know the law, as is often done, and yet hold on the other that when a plaintiff *does* "know" the law, *i.e.*, the holding in *Sidoran*, and that law provides him with an excuse, he cannot rely on that same law to his advantage. In essence, whether the imputation of knowledge regarding the law works to plaintiff's disadvantage, or to his advantage, we believe the sounder approach is to recognize that one is facing no more than "both sides of the same coin."

Given the foregoing, in measuring the period of delay in the case at bar commencing with the second passover on September 17, 1973, as explained *supra*, and ending with the date plaintiff filed his application with the AFBCMR, *i.e.*, May 20, 1980, the total delay period factors to *six years, eight months, and three days* (if we use the day on which plaintiff filed his petition in this court, *i.e.*, May 28, 1980, we simply add eight days—however, we do not deem an eight-day difference to be significant). To arrive at the portion of said total delay period we deem to be *unreasonable*, we find it to be appropriate in this case to reduce said total delay period by the incumbency period of *Sidoran*, which we believe to be excusable. Because *Sidoran* was good law and plaintiff was entitled to rely

thereon from February 23, 1977 through April 16, 1980, a period of three years, one month and 21 days, we find the period of unreasonable delay, on these facts, to be three years, six months, and 12 days.

#### 4. *Prejudice to the Defendant*

Regarding the final operative element of the laches formula, prejudice to the defendant due to plaintiff's unreasonable and inexcusable delay, two grounds have been asserted by defendant: (1) that the government will be obliged to pay "two salaries, over a long period of time [*i.e.*, four years and 11 months], when it received the services of only one person," Defendant's Motion at 9, *quoting Brundage*, 504 F.2d at 1386–87; and (2) that plaintiff's delay has resulted in the "inevitable fading of the memories of witnesses" such that defendant's ability to "explore the validity" of plaintiff's assertions is "seriously hinder[ed]." *Id.* at 10. As for the strength of the showing required, defendant relies on *Cason v. United States*, 471 F.2d at 1225, for the proposition:

> that the longer the delay by a plaintiff in filing suit, the less need there is to search for specific prejudice and the greater the burden of plaintiff to go forward with the evidence to demonstrate lack of prejudice.

*Pepper*, 8 Cl.Ct. at 676.

In opposition, plaintiff strenuously argues the absence of any significant prejudice to defendant for the following reasons: (1) the amount of back pay that is due him is fixed by the limited period from the date of the wrongful discharge (May 31, 1974) to the date of his retirement (April 30, 1979) following reenlistment; (2) said amount of back pay would be subject to a substantial offset consisting of all active duty pay and allowances received during the same period in his status as a reenlisted non-commissioned officer; (3) a judgment for said net amount would not cause an increase in his present retirement pay; and (4) finally, the Claims Court on March 19, 1983, with the consent of defendant, entered judgment favorable to sixteen *similar cases regarding*

*10 U.S.C. § 266(a) violations* where the same or similar boards had acted, and, more importantly, in the *Schiff* case, the same selection board as was involved in this case acted. PX 12 and PA 26.[7]

On the facts at bar, we have substantial misgivings with defendant's arguments relative to both the degree of prejudice required *in this case*, as well as with the actual prejudice that has been established. While it is true, as recently affirmed by the CAFC in the *Pepper* case, that "[t]he longer the delay by a plaintiff in filing suit, the less need there is to search for specific prejudice and the greater the shift to plaintiff of demonstrating lack of prejudice," *Pepper*, 794 F.2d at 1574–75, *quoting Deering*, 620 F.2d at 246, nevertheless, the case at issue is clearly not a "proper case," as contemplated in *Pepper*, where prejudice "may be presumed ... from *undue* delay." (emphasis added). To warrant the presumption of prejudice, based on a period of omission, requires that such a delay, in time, be "undue."[8] Webster's Collegiate Dictionary defines "undue" to mean "excessive." We, therefore, believe that the quantum of delay for purposes of invoking the presumption of prejudice is measurably greater than the quantum of delay necessary to establish "unreasonable" delay required to meet the initial element of the doctrine of laches. As to the latter situation, we view that quantum to contemplate a period of delay only beyond that which is reasonable under the circumstances. Thus, we see no incongruence in finding that the delay, on the facts here, was sufficient to meet the unreasonable test as to the initial element, but yet was wanting in meeting the more stringent test of "undue" delay for purposes of presuming prejudice. In other words, the undue delay period for purposes of raising the presumption, is, of course, more egregious.

Because of the foregoing, we are inclined to find that the delay at bar of three years and six months (after considering the period of incumbency of *Sidoran*) was not excessive so as to be deemed "undue" within the contemplation of *Pepper*, *supra*. Consequently, we do not view this case as one in which it is appropriate to presume prejudice, but rather, it is one in which we believe a showing of *specific* prejudice, by defendant, is required. We are guided, to some extent, by the admonishment of the *O'Brien* court, wherein it stated that:

> [O]nly where *some great injustice* would be done the defendant *by so long a delay* by the claimant that the doctrine of laches should be set up to defeat consideration of the claim on the merits.

*O'Brien*, 148 Ct.Cl. at 4 (emphasis added). Also, *Pepper*, *supra*, talks in terms of "[t]he *longer* the delay ... the greater the shift to plaintiff to demonstrating lack of prejudice." (emphasis added).

Given the foregoing, we now proceed to determine whether the period of unreasonable delay (*i.e.*, three years and six months), which we now find was *not* "undue" delay, imposed on the defendant "some great injustice" to its prejudice. In determining the foregoing, we discuss the specific prejudice averred by the defendant, to wit—(i) the payment of two salaries over a period of four years and 11 months (*i.e.*, from the date of discharge to the date of plaintiff's retirement), and (ii) the fading of memories of defendant's witnesses due to the alleged unreasonable "six year" delay.

As for monetary prejudice, "[i]n and of itself, ... this may not [always] be sufficient prejudice for [the] application of the bar of laches." *Shafer v. United*

---

7. In the *Schiff* case, plaintiff was reinstated and judgment was entered in his favor in an amount *in excess of $50,000*. As to the remaining 15, plaintiffs all were similarly reinstated and the judgments in their favor ranged from $31,000 to $74,500.

8. The CAFC noted in *Pepper*, 794 F.2d at 1575, that "[t]he prejudice to be presumed from undue delay may include such problems as difficulty in finding witnesses and documents, difficulty in reviving fading memories, or, *in some situations*, the paying of two salaries for one position or the paying for services not performed." (emphasis added).

**122**

*States*, 1 Cl.Ct. 437, 439 (1983). At the same time, we do recognize that, no doubt, there have been situations where monetary prejudice alone has been held to suffice. *See Brundage*, 504 F.2d at 1386–87. On the whole, however, we believe that the *Pepper* court, *supra*, voiced a more limited role for monetary prejudice by holding that only *"in some situations"* can monetary prejudice flow from a plaintiff's unreasonable and inexcusable delay. The rationale for this qualification is manifested in the observation by Judge Mayer in *Shafer*, *supra*, wherein he states that:

> To some extent, double payment or payment for unnecessary personnel is an inevitable consequence of successful litigation of this sort. *That is part of the burden the government must bear when a plaintiff prevails.*

*Shafer*, 1 Cl.Ct. at 439 (emphasis added). We wholeheartedly agree with *Shafer*, and we further recognize that the facts here fall within that unique "some situations" in which prejudice shall *not* be presumed from monetary considerations required to be paid, as here. *Cf. Pepper*, 794 F.2d at 1575.

■ In terms of actual monetary prejudice, defendant has asserted that "the possibility of being required to pay plaintiff for six years [9] of back pay is sufficient prejudice to justify the application of laches." Defendant's Opposition Brief at 6. From this statement, it would appear that defendant has taken the position that the *entire* $49,119.54, claimed by plaintiff as back pay, factors into the determination of actual monetary prejudice for purposes of laches. We cannot and do not agree. It has long been the practice of this court, and that of our predecessor, in applying the doctrine of laches, to only hold plaintiffs accountable for that degree or amount of prejudice which *flows from, and was accrued during,* the plaintiff's *period of unreasonable and inexcusable delay.* Under the facts at bar, that period is only three

years, six months, and 12 days (*i.e.,* the difference between the total period of delay of six years, eight months, and three days, and the period of *Sidoran's* incumbency of three years, one month, and 20 days). It would stand equity on its head to hold a plaintiff responsible, as defendant contends, for some form of prejudice which cannot be directly traced to that plaintiff's own dilatory actions. Given the peculiar facts of this case, to find monetary prejudice in the amount of plaintiff's total claim for relief ($49,119.54) would, in our judgment, be clear legal error.

Our task, then, is to allocate the gross amount of back pay, to which plaintiff is otherwise entitled, in order to determine whether the amount allocated to the period of unreasonable delay is sufficient monetary prejudice, as asserted by defendant, to satisfy the last element of the laches doctrine. In so doing, we recognize, given the complex nature of plaintiff's back pay calculation, that mathematical precision is not readily attainable. While there is no case in which a specific minimum dollar amount of back pay was held to be sufficient to constitute the "floor" in determining monetary prejudice, we nevertheless do not find this issue to be particularly troublesome. Relativity is all that is attempted and required. *But see Park v. United States*, 10 Cl.Ct. 790, 793 (1986), where Judge Nettesheim held that approximately $19,000 "does not constitute significant monetary prejudice."

The central focus with regard to allocating the appropriate amount of monetary prejudice in this case is to excise from the gross back pay amount due that portion which accrued during the period of the incumbency of *Sidoran*. This is required because, as noted *supra*, we have found this to be a period of delay during which time plaintiff possessed a legally sufficient excuse. There are two somewhat analogous methods of effecting this allocation. First, a ratio may be formed by taking as

**9.** The six-year period averred is totally in error. The aggregate period of back pay is only four years and 11 months, *i.e.,* the time elapsed between plaintiff's involuntary discharge on May 31, 1974, and the date of his retirement, April 30, 1979.

the denominator 2,435 days, *i.e.*, the total time of plaintiff's period of unreasonable delay, *including* the period of *Sidoran's* incumbency. The numerator (1,289 days) is then defined as being the total time of plaintiff's unreasonable *and* inexcusable delay, which would *exclude* the period of *Sidoran's* incumbency. Applying this ratio (52.4%) to the total amount of plaintiff's back pay due ($49,119.54), the approximate amount of monetary prejudice due to plaintiff's unreasonable *and* inexcusable delay is $26,003.88. This is the most favorable scenario to plaintiff.

An alternative to this approach (favorable to defendant) would be to posture a ratio using as the denominator 1,795 days, *i.e.*, the total time during which plaintiff actually *accrued* the back pay being claimed, including, to the extent relevant, the period of *Sidoran's* incumbency. The numerator (998 days) in this calculation is then the number of days within that accrual period representing both unreasonable and inexcusable delay, which would exclude, to the extent relevant, the period (797 days) of *Sidoran's* incumbency. Applying this ratio (55.6%) to the total amount of plaintiff's back pay ($49,119.54), the approximate amount of monetary prejudice due to plaintiff's unreasonable and inexcusable delay is $27,310.46. Giving the defendant the benefit of every doubt, we adopt for purposes of monetary prejudice in this case, the latter amount, $27,310.46, which is *net of all appropriate offsets.*

As previously noted, *supra*, our research has disclosed no pointed case in this circuit, or in our predecessor court, which quantifies the boundaries of acceptable or unacceptable monetary prejudice. In our view, however, we believe this is more a circumstance manifesting the fact that relativity is the relevant inquiry, *i.e.*, in terms of all of the peculiar facts and circumstances surrounding the case.

Against this background, therefore, we believe that it is appropriate to apply a scale which reflects a need for requiring greater monetary prejudice, whereas here the defendant's showing of other forms of evidentiary prejudice is *di minimus, infra.* In other words, standing alone, sufficient monetary prejudice is, on these facts, indeed a heavy burden.[10]

In view of the foregoing circumstances surrounding the accrual of prejudice in this case, we must conclude that the amount ($27,310.46) of back pay attributable to the period of unreasonable delay does not constitute substantial monetary prejudice of a degree sufficient to warrant invoking the bar of laches. First, and most importantly, we note that defendant has made no creditable showing of evidentiary prejudice in this case. Nor do we believe, for the reasons outlined herein, that any such showing is indeed even possible. Secondly, we note that the impact of any award in this case is strictly limited to the $49,119.54 in back pay calculated by the Air Force and certified to the court by the defendant. In other words, were plaintiff to prevail on the merits, the judgment would not contemporaneously entitle plaintiff to a stepped-up pension, as can be the case, in addition to the foregoing amount. Thirdly, and equally important, is the fact that as stated *supra*, this is *not* a case where prejudice may be presumed to flow from the plaintiff's delay. Given only a three-year, six-month, and 12–day delay, the burden, therefore, rests heavily on the defendant to demonstrate a sufficient degree of *actual* prejudice, which proof has not been met. On the basis of all the considerations heretofore cited, we find that $27,310.46 in monetary prejudice is *not* a sufficient showing of actual prejudice for purposes of invoking laches.

As plaintiff has aptly argued, the issue relative to the efficacy of the 1972 and 1973 selection boards, as structured, is purely and simply legal, *i.e.*, whether, as composed (only one reserve officer of its 27 members), those boards were in conformity

---

10. *"The equities* on both sides *should* be carefully weighed, and it should be clear that they *weigh heavily on the side of defendant before the court refuses to hear a case* because of a delay of less than the statutory period." *See O'Brien,* 148 Ct.Cl. at 4 (emphasis added).

with 10 U.S.C. § 266(a). The composition of said boards has been duly recorded and is not in dispute. It is part of the certified administrative record defendant itself has forwarded to the court. Therefore, it is difficult to understand how the passage of time could in any way adversely affect the defendant on this issue if it were required to go to the merits.

Moreover, defendant's assertion relative to "the inevitable fading of the memories of witnesses," is quite bland. Defendant makes not even the slightest showing, or any attempt at showing, how the operative facts on said issue have been blurred by time. As stated *supra*, this not being an appropriate case of "undue delay" where prejudice may be presumed, in light of a period of only three years, six months, and 12 days delay, we must carefully look to the existence of *actual* prejudice, if any, as factually demonstrated by the defendant. This court held in the *Pepper* case that "[i]n establishing the affirmative defense of laches, the burden of proof rests with the defendant...." *Pepper*, 8 Cl.Ct. at 671.[11] Equity, therefore, demands that the defendant adequately fulfill its burden given the drastic consequences for plaintiff which flow from a court invoking the bar of laches. Defendant has failed that burden. *Deering*, 620 F.2d at 245, teaches, *inter alia*, that the " ... equitable defense [of] laches will be applied after courts weigh all factors ... to be sure that injustice does not result to either party."

Having weighed all facts, we conclude that injustice would clearly ensue if, on the proof proffered, we were to apply the laches doctrine. We therefore decline to do so.

Our conclusion with respect to laches in bar of plaintiff's § 266(a) claim is that it is legally deficient. While plaintiff did impermissibly delay some three years and six months in seeking relief on the basis of § 266(a), we have concluded that the government was not sufficiently prejudiced thereby for equity to favor an application

of the bar of laches. We proceed *infra*, therefore, to the merits of plaintiff's claim for relief based on the alleged violation of 10 U.S.C. § 266(a).

### B. *Plaintiff's § 266(a) Claim*

The gravamen of plaintiff's claim on the merits is that his "consideration for promotion to the temporary grade of major by the 21 August 1972 and 17 September 1973 selection boards was [carried out] in violation of former [§ 266(a), Title] 10 U.S.C. in that the membership of [each] said selection board did not include an *appropriate number* of reserve officers." Plaintiff's Cross-Motion at 28 (emphasis added). In proof of his claim, plaintiff points to the admitted fact that only one officer out of 27 officers on each of his two selection boards was a reserve officer, whereas those boards were then considering for promotion groups of officers of which 25.4% and 35%, respectively, were Reserve officers. Plaintiff, initially, presented this claim of legal error to the AFBCMR in his application dated May 20, 1980. Thereafter, in an extensive brief filed on November 20, 1981, plaintiff submitted a detailed legal analysis of the operative issues, including a comment on the Court of Claims' decision in *Stewart v. United States*, 611 F.2d 1356, 222 Ct.Cl. 42 (1979).

The AFBCMR, in Executive Session on January 24, 1984, rejected plaintiff's claim for administrative relief, and thereafter issued its final decision on April 13, 1984. The board found, *inter alia*, that there was "no clear-cut evidence" of abuse of discretion by the Secretary of the Air Force in assigning membership to the selection boards as previously stated. Administrative Record at 9. The board then went on to ventilate its objections to the Court of Claims' decision in the *Stewart* case by stating that:

> The *Stewart* court concluded that one Reserve officer out of 25 on the FY1975 Board was legal error, but the Court

---

11. Except, of course, in appropriate circumstances, not present here, where "[t]he *longer* the delay ... in filing suit, the less need there is

to search for specific prejudice * * * and ... prejudice ... [may be] presumed from *undue delay....*" *Pepper*, 794 F.2d at 1574–75.

declined to enter a final judgment because the Correction Board had not had the opportunity to consider the Reserve representation issue. We have given the matter earnest consideration and have concluded that neither error nor injustice has been shown. In our view, the Secretary exercised his statutory discretion in a reasonable manner.

7. We have little doubt concerning the position of the Court on this issue. Nonetheless, because of the reasons cited herein, we respectfully disagree.

*Id.* at 9–10. As indicated, the board offered a number of reasons why it believed the composition of the boards (one reserve officer of the 27 members) in the case at issue was not prejudicial to the plaintiff. In particular, the board concluded that there was no evidence that "any one member or grouping ... [had] deprived the applicant of a fair and impartial consideration." *Id.* at 10.

▉ Generally, in assessing the performance of the AFBCMR, we are bound to uphold that decision unless the plaintiff can demonstrate that said decision was either arbitrary, capricious, unsupported by substantial evidence, or contrary to law. *Braddock v. United States,* 9 Cl.Ct. 463, 472 (1986). As more fully explained by the Court of Claims in the case of *Sanders v. United States,* 594 F.2d 804, 811, 219 Ct.Cl. 285 (1979), the standard of review is—

> Once a plaintiff has sought relief from the Correction Board, such plaintiff is bound by that board's determination unless he can meet the difficult standard of proof that the Correction board's decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due.

While we note in this particular case that the defendant has failed to oppose plaintiff's summary judgment motion on the merits, the burden nonetheless remains with the plaintiff to show that the legal error or injustice alleged is "substantial, material and prejudicial...." *Braddock* 9 Cl.Ct. at 473, *citing Sanders,* 594 F.2d at 811; *Skinner v. United States,* 594 F.2d 824, 828, 830, 219 Ct.Cl. 322 (1979); *Cruz-Casado v. United States,* 553 F.2d 672, 675, 213 Ct.Cl. 498 (1977).

The specific error alleged by the plaintiff here is strictly a legal one premised on the fact that the AFBCMR failed to properly apply the requirements of former § 266(a), Title 10 U.S.C., to the facts of this case. In other words, the claim is that the AFBCMR erred in failing to find that the precise composition of the 1972 and 1973 selection boards was illegally constituted in violation of § 266(a) in that an appropriate number of Reserve officers was not assigned to the respective boards. This omission by the Secretary of the Air Force, it is argued, constitutes a clear abuse of his discretion. Our task then is a narrow one, consisting of appropriately interpreting § 266(a) to determine whether the AFBCMR erred in denying plaintiff's petition alleging legal error regarding the composition of the selection boards.

▉ As recently explained by the Federal Circuit, "[s]tatutory analysis requires first that we look to the express language of the statute to determine its meaning." *Reid v. Department of Commerce,* 793 F.2d 277, 281 (Fed.Cir.1986), *citing United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). "If it is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute." *Id., citing United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1280, 6 L.Ed.2d 575 (1961). If the statutory language is unclear, however, we are then bound to review the applicable legislative history to discern the intent of Congress. *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). In either case, we are to keep foremost in our minds that " '[w]hen faced with a problem of statutory construction, ... great deference [is to be shown] to the interpretation given the statute by the officers or agency charged with

its administration.'" *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978), *quoting Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). In order to sustain an agency interpretation of a statutory term, "'we need not find that its construction is the only reasonable one, or even that it is the result we would have reached'" on our own. *Id.* Rather, the question is whether the "Department's interpretation is 'sufficiently reasonable' to be accepted by a reviewing court." *Id., quoting Train v. Natural Resources Defense Council,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975).

The statute governing the composition of the selection boards here in issue, former 10 U.S.C. § 266(a) (1976), states:

Each board convened for the appointment, promotion, demotion, involuntary release from active duty, discharge, or retirement of Reserves *shall include an appropriate number of Reserves,* as prescribed by the Secretary concerned under standards and policies prescribed by the Secretary of Defense.

(emphasis added). On its face, it cannot be denied that the words of the statute offer little express guidance as to what an "appropriate number of Reserves" is in any particular case. In fact, the statute delegates the responsibility of "prescrib[ing]" or determining said appropriate number of reserves to the discretion of the Secretary of the armed forces concerned (in this case, the Air Force), upon "standards and policies" of the Secretary of Defense, consistent, of course, with the intent of Congress.

The relevant legislative history, while rather scant, does on its face present a somewhat more focused view of the proper construction of the phrase, "an appropriate number of reserves." In the Senate Report accompanying the bill which was to become the "Armed Forces Reserve Act of 1952," under Chapter VII: Administration, Section 249, it states:

The term "appropriate numbers" rather than a fixed ratio is used, since the same board may be considering both Regular and Reserve personnel. In such case the proportion of Reserve officers on the board should be roughly equal to the proportion of Reserves being considered. S.Rep. No. 1795, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Adm. News 2005, 2042. It would appear, from the foregoing, that this excerpt expresses a clear congressional intent that by the phrase "appropriate number," it was meant that the number of reserves on the selection board should be "roughly proportional" to the component of reserves being considered by that board. Such an interpretation for several reasons, however, has been expressly rejected by the Federal Circuit in the case of *Bockoven v. Marsh,* 727 F.2d 1558 (Fed.Cir.1984).

In *Bockoven,* the District Court for the District of Columbia rejected the plaintiffs' claim that the selection boards which had twice passed them over for promotion were improperly constituted because they lacked an "appropriate number of reserves" pursuant to 10 U.S.C. § 266(a). In affirming the opinion of the district court, the Federal Circuit stated that:

[A]ppellants argue that the legislative history of section 266(a) required proportionate equality between the number of reservists on the board and the number of reservists the board considers. They rely primarily on the statement in the House and Senate committee reports that "the proportion of Reserve officers on the board should be roughly equal to the proportion of Reserves being considered." Our reading of the legislative history, however, produces a different conclusion.

*Bockoven,* 727 F.2d at 1565 (citations omitted). In sum, the court concluded, given other contemporaneous legislative events, including a review of an earlier draft of § 266(a), that:

[S]ection 266(a) ... [did not] limit [] the Secretary's authority to establish Reserve representation on the boards to specifying the boundaries of rough equality. Rather, we conclude that Congress intended to give him broad discre-

tion to specify by regulation what constitutes an appropriate number of reservists.

*Id.* We are, of course, bound by this interpretation of the legislative history of § 266(a).

 While the *Bockoven* court emphasized that the Secretary, by statute, had broad discretion to determine how many reservists to include on any particular selection board, said statute (§ 266(a)), delineating an appropriate number, "left it to the Secretary to 'prescribe' that number under 'standards and policies' prescribed by the Secretary of Defense." *Id.* at 1564. Thus, the sole limitation on the Secretary of the Air Force in this case at bar is that he must implement § 266(a), in his discretion, "in accordance with those standards and policies" promulgated by the Secretary of Defense. *Id.*

 In that connection, the Secretary of Defense has set forth "standards and policies" in Department of Defense Instruction No. 1205.4 (June 23, 1959), which issued to the Secretaries of the armed forces. Said standards and policies, regarding § 266(a), provide that:

> The intent of the Congress in this Section is clear, that a member of a reserve component who is the subject of any of the indicated board actions *shall be assured a fair representation of reserve membership on the board. The Secretaries* of the military departments *will ... provide in the membership of the indicated boards*, to the fullest practicable extent, *a fair and adequate representation of members from the reserve components.*

(emphasis added). Interestingly enough, this directive does not even use the words "an appropriate number of reserves" in its explanation. Nevertheless, the equally discretionary expression "a fair representation of reserve membership" appears, arguably, in its place. Whatever the Secretary of Defense intended by this directive relative to his statutory obligation to assure an "appropriate number of reserves," we find nothing here to delimit, based on propor-

tionality, the discretion of the Secretary in assigning Reserve officers to selection boards.

Looking next at the resulting regulations promulgated by the Air Force pursuant to the Secretary of Defense's directive, there appears a similar affirmance of the discretionary nature of the Secretary's authority but little guidance, if any, as to the meaning of "appropriate number" of reserve officers:

> b. Board Composition:
>
> (1) Each board must include at least five commissioned officers. *If members of reserve components are among the officers being considered for promotion, the board must include an appropriate number of Reserve officers.* Board members must be serving on active duty in grades higher than that of any officer the board will consider and should have higher permanent grades.

AFR 36–89 ¶ 28b (28 April 1971) (emphasis added). Thus, as with the Secretary of Defense's policy directive, *supra*, there is no discernible mathematical component to the formula the Secretary of the Air Force had to follow in assigning Reserve officer representation to the boards. In fact, it does not appear from this regulation that any attempt was made to require even rough "proportionality" between Reserve officers on the selection board, and Reserve officers being considered by the board.

From the foregoing circumstances, *supra*, in particular the decision of the *Bockoven* court, it is clear that the Secretary of the Air Force possesses broad, *though not unfettered*, discretion in the assignment of officers to the selection boards. Certainly, the language of the statute does not force a different result; nor does the policy statement of the Secretary of Defense or AFR 36–89. Notwithstanding the foregoing, we nonetheless part company with the efficacy of the Secretary's discretion, as exercised in this case for the reason that *on the facts here*, we find it to be arbitrary and capricious, thus an abuse.

In reaching this conclusion, we are fully mindful of the heavy showing which must accompany a finding of abuse of discretion. Nevertheless, and all due deference to the Air Force Secretary and the AFBCMR's determination, we do not find this to be a troublesome or even a close case on the merits in view of the persuasive evidence. While by our holding we imply no hard and fast rule as to the meaning of the phrase "an appropriate number of reserves," we do find, unequivocally, however, that the mere tokenism evident *in this case* fails to fulfill that minimum standard. The operative facts show, in the case at bar, that the Secretary of the Air Force had before him in 1972 and 1973 groups of officers subject to promotion of which 25.4% and 35%, respectively, were reserve officers. Under the discretionary authority vested in him pursuant to § 266(a), the Secretary assigned only *one* Reserve officer, out of *27* officers who were members of each of the 1972 and 1973 selection boards. By comparison, therefore, the 1972 selection board had a reserve component of 3.7% when it was considering a promotion group which had a reserve component of 25.4%. Similarly, the 1973 selection board had a reserve component of 3.7% when it was considering a promotion group of officers which had a reserve component of 35%. It strains credulity, therefore, to imagine on what rational basis the Secretary of the Air Force found these ratios to reflect an appropriate number of reserves, if he indeed did at all, in view of the observations by the *Stewart* court.

In the *Stewart* case, which is heavily relied on by the plaintiff, the Court of Claims reached a similar conclusion to that described herein on even less egregious facts than those before the Secretary and the AFBCMR here. In *Stewart*, the plaintiff, a Reserve officer, was also twice passed over and involuntarily released from the Air Force. His release followed a passover by a 1975 selection board comprised of 25 members, only one of which was a Reserve officer. Relying on the identical statutes and regulations applicable to the case at bar, the court there concluded that:

> This was an abuse of discretion. One Reserve officer out of 25 on the board is not (under the statute, legislative history, Air Force regulations and DOD instructions) an appropriate number *in this case* and was legal error. Further, it is provided by 10 U.S.C. § 277 (1976), as follows:
>
> Laws applying to both Regulars and Reserves shall be administered without discrimination—
>
> (1) among Regulars;
>
> (2) among Reserves; and
>
> (3) between Regulars and Reserves.
>
> Plaintiff therefore appears to be entitled to have his nonselection for promotion by the 1975 selection board voided.

*Stewart*, 611 F.2d at 1360 (emphasis added).

While no final judgment was ever entered by the court in the *Stewart* case, because the case was remanded to the board and ultimately amicably settled, we do not find that fact to be an impediment to relying on the *Stewart* decision as definitive guidance. Therefore, applying the *Stewart* court's reasoning to the facts here, we do not hesitate to conclude, on that basis, that the Secretary of the Air Force acted with a similar abuse of discretion in composing plaintiff's 1972 and 1973 selection boards. If a ratio of 4% reserve component on the board, with a 30% reserve component in the promotion group constitutes an abuse of discretion in *Stewart*, then the analogous 3.7% and 25.4% for the 1972 selection board and, *a fortiori*, the 3.7% and 35% for the 1973 selection board in the case at bar manifests an even more extreme case of an abuse of discretion. Therefore, if the plaintiff in *Stewart* deserved to have his 1975 passover voided, plaintiff here has a stronger case for such relief.[12]

12. We wish to note that we find nothing in our decision here today to be in any way inconsistent with the Federal Circuit's decision in the case of *Bockoven*, 727 F.2d at 1558. In *Bocko-*

As we outlined at the outset, to uphold the decision of an agency interpretation of a statute, " 'we need not find that it is the only reasonable one, or even that it is the result we would have reached.' " *See supra*. Were that not the case, we would have expounded far less in reaching the identical conclusion stated here today. Rather, the question is whether even after according the administrative agency all due deference, which in this case was extensive, the "Department's interpretation is 'sufficiently reasonable' to be accepted by a reviewing court." *See supra*. After carefully reviewing the decision of the AFBCMR regarding § 266(a), the applicable regulations and DOD policy guidelines, as well as the decisions of the predecessor Court of Claims in the *Stewart* case, and the Federal Circuit in *Bockoven*, we find, as a matter of law, that the Secretary of the Air Force's discretion, as exercised, was clearly unreasonable—thus an abuse thereof. In denying the plaintiff's claim that the 1972 and 1973 selection boards did not contain "an appropriate number of reserves" as outlined in 10 U.S.C. § 266(a), the AFBCMR committed legal error which was substantially prejudicial to plaintiff. For that reason, the plaintiff's passovers by those 1972 and 1973 selection boards ought to be, and hereby are, voided.

III. *Conclusion*

In sum, we find that while plaintiff may have impermissibly delayed in seeking relief based on the Air Force's violation of § 266(a), that delay did not give rise to sufficient prejudice to require his claim to be barred by the equitable doctrine of laches. Defendant's motion for summary judgment is, therefore, DENIED. Plaintiff, however, has persuasively carried his bur-

den with respect to the violation of § 266(a) and, therefore, the passovers are voided. Accordingly, plaintiff's cross-motion is GRANTED to the following extent:

(1) Plaintiff shall recover from the United States the sum of $49,119.54, with costs; and

(2) The Secretary of the Air Force shall correct plaintiff's records:

(a) by voiding plaintiff's failure of selection for promotion to the temporary grade of Major by the 21 August 1972 and 17 September 1973 selection boards;

(b) by voiding plaintiff's release from extended active duty on May 31, 1974;

(c) by voiding plaintiff's enlistment in the United States Air Force on June 1, 1974;

(d) to show plaintiff's retroactive restoration to extended active duty in a commissioned status as of May 31, 1974; and

(e) to show plaintiff served on extended active duty in a commissioned status during the period from May 31, 1974 to April 30, 1979.

In all other respects, plaintiff's cross-motion for summary judgment is hereby DENIED. The Clerk shall enter judgment accordingly.

IT IS SO ORDERED.

---

*ven*, the facts were substantially different. Most importantly, the precise board compositions upon which the court concluded there *was* "an appropriate number of reserves," contained Reserve components well *above* those in both this case and in the *Stewart* case. In particular, as the court found in *Bockoven*, "the percentage of reservists on the board ... ranged from 20 to 13.3, and the comparative percentages of the reservists on the board and among the officers considered ranged from more than twice as many to slightly more than one-third." *Id.* at 1566. Here, as we have outlined *supra*, the percentage of reservists on the board was a constant 3.7%. While the *Bockoven* court expressly limited its holding and that of the *Stewart* case to their respective facts, the facts in the case at bar reach a new "low" in arbitrariness relative to the board composition in *either Bockoven* or *Stewart*.